IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN ANTHONY CASTRO )
   12 Park Place )
   Mansfield, TX 76063 )
   Tel. (202) 792-6600 )
      Plaintiff, )
         )
         )
*vs.* )
         )
         )
FEDERAL ELECTION COMMISSION )
   1050 First Street, NE )
   Washington, DC 20463, )
      Defendant. )

Case: 1:22−cv−02176 JURY DEMAND
Assigned To : Contreras, Rudolph
Assign. Date : 7/25/2022
Description: Gen. Civ. (F−DECK)

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

TO THE HONORABLE COURT:

Plaintiff, JOHN ANTHONY CASTRO, appearing *pro se*, files this Complaint against the Federal Election Commission ("Commission") and alleges as follows:

### EXECUTIVE SUMMARY

1. Because the FEC's regulations interpreting 52 U.S.C. § 30101(2)(B) are invalid as a matter of law given the statute being clear and unambiguous on its face, the regulations exceeding the plain meaning of the statute, and contrary to Congressional intent, the FEC has no discretion to refuse to enforce the statutory determination that Donald J. Trump is a candidate that must file FEC Form 2, Statement of Candidacy. As part of this same action, Plaintiff asserts

RECEIVED
JUL 25 2022
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

that the FEC's acceptance of Donald J. Trump's FEC Form 2, Statement of Candidacy, is tantamount to state action acknowledging Donald J. Trump's qualification and/or eligibility to pursue and/or hold public office in violation of Section 3 of the 14th Amendment to the United States Constitution for Donald J. Trump's involvement in the January 6th Insurrection that would result in and perpetuate a direct competitive injury on Plaintiff who is also an FEC-registered 2024 Republican Primary Presidential Candidate by allowing a constitutionally ineligible individual to solicit and raise vast sums of funds in anticipation of the 2024 Presidential Election.  This is not a question of state law eligibility; it is a federal question under the Constitution of the United States and ripe given the inevitable state action by the FEC.

### LEGAL NATURE OF THE ACTION

2.      This is an action under the Federal Election Campaign Act (the "Act"), 52 U.S.C. § 30109, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, for unlawful agency delay against the Commission.

3.      Plaintiff seeks declaratory and injunctive relief to compel the Commission to recognize Donald J. Trump as a deemed "candidate" for the Presidency of the United States under 52 U.S.C. § 30101(2), to compel Donald J. Trump to file FEC Form 2, and to block the Commission's acceptance of FEC Form 2 pursuant to Section 3 of the 14th Amendment for Donald J. Trump's involvement in the January 6, 2021, insurrectionary attack on the United States Capitol that was intended to prevent the certification of the 2020 Presidential election results.

4.     Plaintiff demands that the Commission enforce the statutes enacted by Congress that require it to compel full compliance by Donald J. Trump under the Act, including the filing of FEC Form 2, Statement of Candidacy.

5.     Plaintiff demands that the Commission deny the acceptance of Donald J. Trump's FEC Form 2 pursuant to Section 3 of the 14th Amendment for Donald J. Trump's involvement in the January 6 Insurrection.

## JURISDICTION & VENUE

6.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A) and 5 U.S.C. § 702.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7.     Venue is proper in this district under 52 U.S.C. 30109(a)(8)(A), 5 U.S.C. § 703, and 28 U.S.C. § 1391(e)(1)(B).

## PARTIES

8.     John Anthony Castro is a U.S. Citizen and Republican primary presidential candidate (Candidate FEC ID Number P40007320) for the 2024 Presidential Election.

9.     Defendant is Federal Election Commission of the United States of America.

## PLAINTIFF'S STANDING TO BRING SUIT

10.     A fellow primary candidate, whose injury would be competitive injury in the form of a diminution of votes and/or fundraising, has federal judicial

standing to sue a candidate he or she believes is ineligible to hold office. *See Fulani v. League*, 882 F.2d 621 (2d Cir. 1989). Allowing Donald J. Trump to continue being perceived as an eligible candidate in violation of Section 3 of the 14th Amendment of the United States Constitution by allowing the Commission to accept his FEC Form 2 constitutes unlawful state action that allows a competitive injury to Plaintiff and bestows a competitive advantage in the same Republican primary in which Plaintiff competes with Donald J. Trump. *See Citizens for Resp. & Ethics in Washington v. Trump*, 939 F.3d 131, 143 (2d Cir. 2019).

11. Plaintiff filed a notarized administrative complaint with the Commission on March 23, 2022, alleging, among other things, that Donald J. Trump has raised funds in excess of $5,000, expended funds in excess of $5,000, and has given his consent to others to do the same, which required the Commission to declare him a candidate who must file FEC Form 2, Statement of Candidacy, and fully comply with federal and state campaign finance laws. The Commission acknowledged the complaint on March 24, 2022.

12. The Commission, contrary to law, has failed to act within the prescribed 120-day period, which expired at the end of the business day on Friday, July 22, 2022; therefore, Plaintiff is entitled to seek judicial action in the United States District Court for the District of Colombia pursuant to 52 U.S.C. § 30109(a)(8) on Monday, July 25, 2022.

RELEVANT LAW & LEGAL ANALYSIS

**Donald J. Trump's Deemed Candidacy**

13.     52 U.S.C. § 30101(10) defines the term "Commission" as the "Federal Election Commission."

14.     52 U.S.C. § 30101(2) defines the term "candidate" to mean an "individual who seeks nomination for election, or election, to Federal office."

15.     52 U.S.C. § 30101(2)(A) mandates that "for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election... if such individual has received contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000."

16.     52 U.S.C. § 30101(2)(B) further mandates that "for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election... if such individual has given his or her consent to another to receive contributions or make expenditures on behalf of such individual and if such person has received such contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000."

17.     These were not mere definitions; they were Congressional mandates.

18.     In enacting these statutory definitions and determinations of candidacy, Congress unambiguously expressed its intent to clearly define a "candidate" to extinguish agency discretion.

19.     Nevertheless, the Commission invented an artful yet unlawful regulatory scheme, without statutory support and contrary to law, that has permitted candidates to disregard the clear and unambiguous statute, the plain meaning of said statute, and the intent of Congress. *See U.S. v. Home Concrete &*

*Supply, LLC*, 132 S. Ct. 1836 (2012) (regulations are invalid to the extent they conflict with the plain meaning of the statute); *also see Dominion Resources, Inc. v. U.S.*, 681 F.3d 1313 (Fed. Cir. 2012).

20.     It is an undisputed fact that Donald J. Trump has received contributions in excess of $5,000, made expenditures in excess of $5,000, given his consent to other to raise $5,000, and given his consent to others to expend $5,000. To assert anything to the contrary is willful blindness at best; a fraud upon the Court at worst.  The entire American public can see with their own eyes the endless rallies with "Trump 2024" campaign signs that Donald J. Trump has engaged in.  The federal judiciary must not be willfully blind to what is plainly in its face.

21.     Congress enacted 52 U.S.C. § 30109(a)(8) with the specific intent of waiving sovereign immunity and to strip the Commission of agency discretion that would otherwise apply under the more general Administrative Procedure Act under 5 U.S.C. § 701(a)(2).  *See CREW v. FEC*, 993 F. 3d 880 (D.C. Cir. 2021) (referencing the private right of action provision as an "unusual provision" to avoid analyzing the Congressional intent behind it).  The "specific trumps the general," and the federal judiciary's willful blindness to well-established canons of statutory interpretation is, at best, a dereliction of its duty to permit judicial review.  Other cases finding agency decisions unreviewable did not involve a more specific statutory provision outside of the APA that specifically stripped the agency of unreviewable discretion by providing a private right of action to seek judicial

review.

22.     Determining that an individual is a candidate is not a matter committed to agency discretion; Congress provided a clear and unambiguous rule and specifically sought to thoroughly extinguish agency discretion despite the federal judiciary's repeated attempts to thwart Congressional intent to avoid its duty to review.

23.     11 C.F.R. § 100.72(a) permits an individual to engage in passive activities of an exploratory nature that constitute "testing the waters." Such activities can include conducting polls, making telephone calls, and traveling to meet with prospective donors. *See* 11 C.F.R. §§ 100.72(a), 100.131(a). The Commission lacked the statutory authority to promulgate this regulation that is contrary to Congressional intent and the unambiguous statutory scheme's plain meaning in defining a "candidate."

24.     11 C.F.R. §§ 100.72(b)(1)-(5) and 100.131(b) set forth activities that indicate that an individual has decided to become a candidate and, therefore, do not enjoy the "testing the waters" designation under subsection (a). Activities that raise to such standard occur, by way of illustration only, and not by way of limitation when, "[t]he individual raises funds in excess of what could reasonably be expected to be used for exploratory activities or undertakes activities designed to amass campaign funds that would be spent after he or she becomes a candidate, [t]he individual makes or authorizes written or oral statements that refer to him or her as a candidate for a particular office[,] [t]he individual conducts activities

in close proximity to the election or over a protracted period of time[,] [t]he individual has taken action to qualify for the ballot under State law." *See* 11 C.F.R. § 110.72(b)(2)-(5); 100.131(b)(2)-(5).

25.    The "testing the waters" regulations are a regulatory fabrication of the Commission that conflict with the plain meaning and reading of the statute, has no statutory basis, and must be deemed invalid as a matter of law.  *See U.S. v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836 (2012).

26.    Under 52 U.S.C. § 30102(e), "each candidate for federal office...shall designate in writing a political committee...to serve as the principal campaign committee of such candidate."

27.    Under 52 U.S.C. § 30104, a candidate is required to adhere to campaign finance laws, including, but not limited to, the reporting requirements.

28.    52 U.S.C. § 30107(a)(6) grants the Commission the power to initiate a civil enforcement action to compel compliance.

29.    Pursuant to 11 C.F.R. § 100.3(a)(3), the Commission shall send any deemed candidate a written notification that such person engaged in activities that established such person as a candidate.

30.    This is solely a question of law that this Court must clarify.  This Court must "declare that the... failure to act is contrary to law" and "direct the Commission to conform with such declaration" to classify Donald J. Trump as a "deemed candidate" who must file his FEC Form 2, Statement of Candidacy. *See* 52 U.S.C. § 30109(a)(8)(C).

31.     Thereafter, this Court must enjoin the Commission from accepting Donald J. Trump's FEC Form 2, Statement of Candidacy, for the reasons stated below.

## Donald J. Trump's Ineligibility to Hold Office

32.     Article II, Section 1 of the United States Constitution states that any person who enters the Office of the President of the United States of America shall take the following Oath or Affirmation: "I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my ability, preserve, protect and defend the Constitution of the United States."

33.     Since the founding of our nation, those who assume civil or military positions under federal or state law are required to take an oath and thereby state that they will defend the Constitution of the United States against all enemies, foreign and *domestic*.

34.     Taking the side of a foreign enemy is covered by the Treason Clause in Article III, Section 3, Clause 1 of the United States Constitution. It states: "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid *and* Comfort."

35.     The Anti-Insurrection Qualification Clause in Section 3 of the 14th Amendment of the United States Constitution covers taking the side of a *domestic* enemy.

## Anti-Insurrection Qualification Clause

36.     Section 3 of the 14th Amendment of the United States Constitution

is best described as the Anti-Insurrection Qualification Clause. It establishes that, in order to be eligible to hold any office in the United States, a person must have never violated an Oath of Office, which always includes a pledge to support the United States Constitution.

37.     The Anti-Insurrection Qualification Clause in Section 3 of the 14th Amendment of the United States Constitution states that "[n]o person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have *engaged in* insurrection or rebellion against the same, or given *aid or comfort* to the enemies thereof. But Congress may by a vote of two-thirds of *each* House, remove such disability."

## Amendment XIV, Section 3, Clause 1

38.     Clause 1 of Section 3 of the 14th Amendment of the United States Constitution reads: "No person shall... hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath... to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof."

39.     The word "engaged" for the purpose of Section 3 of the 14th Amendment "implies, and was intended to imply, a voluntary effort to assist the

Insurrection... And further, the... action must spring from [a] want of sympathy with the insurrectionary movement." *See U.S. v. Powell*, 65 N.C. 709 (C.C.D.N.C. 1871).

40.     As the U.S. Supreme Court has articulated, "[w]ithout a statutory definition, [one must] turn to the phrase's plain meaning." *See Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (thereafter referencing Merriam-Webster's Collegiate Dictionary for the plain meaning of a term).

41.     Merriam-Webster's Dictionary defines an "insurrection" to be "an act or instance of revolting against civil authority or an established government." An instance is "a step, stage, or situation viewed as part of a process or series of events." Participation in the early or late stages of an event still constitute "an instance." This would apply to the wife of United States Supreme Court Justice Clarence Thomas, Virginia Thomas, requiring Justice Thomas' mandatory recusal under 28 U.S.C. § 455, which Plaintiff asserts herein to preserve for appeal.

42.     Of the term "revolting," Merriam-Webster says "to renounce... subjection." Renounce is to "refuse to follow, obey, or recognize." Subjection is being "placed under authority." Thus, an insurrection include all stages of the event wherein at *at least one stage* there was a refusal to recognize the authority of an established governmental body, such as the United States Senate and its ceremonial reading of the certified election results and engaging in violence to undermine *both* that process and the United States Constitution.

43.     Donald J. Trump summoned the mob to our nation's Capitol,

organized and assembled the mob, allowed weapons in the crowd by ordering security to let them pass, radicalized the mob with incendiary rhetoric, ordered them to march to the Capitol, refused to make public statements to denounce the violence and call off the mob for 187 minutes, and when it became clear that the mob had failed to use violence to prevent the certification of the election results, then and only then, did former President Donald J. Trump order the mob to go home, but not before saying "we love you" and calling the violent mob "very special" after they had violently attacked the United States Capitol. All of these instances were part of the overall January 6 Insurrection in which Donald J. Trump was directly and irrefutably involved.

44.     Clause 1 of Section 3 of the 14th Amendment to the United States Constitution declares that anyone deemed to have engaged in insurrection are "enemies." However, less focus is given to the fact that Section 3 similarly disqualifies those who have given "aid or comfort" to insurrectionists.

45.     "Aid or comfort may be given to an enemy by words of encouragement, or the expression of an opinion, from one occupying an influential position." *McKee v. Young*, 2 Bart. El. Cas. 422 (1868).

46.     There is a distinction between domestic "aid or comfort" to insurrectionists and foreign "aid and comfort" to invaders. This was highlighted by President Andrew Johnson's comments to a New Hampshire delegation that "Treason is a crime and must be punished as a crime... It must not be excused as an unsuccessful rebellion." *See* J.G. Randall, *The Civil War and Reconstruction*

*707* (1937) (first omission in original). It was later reasoned that if "insurrection and levying war was accepted as treason, hundreds of thousands of men, most of them youths, were guilty of the offense that carried a mandatory sentence of death by hanging." *See* Jonathan Truman Dorris, *Pardon and Amnesty Under Lincoln and Johnson – The Restoration of the Confederates to Their Rights and Privileges 1861-1898*, at 4 (1953). "To the Congress, the old law was unworkable for the [Civil War]... [thus, on] July 31, 1861, Congress passed a law which provided that anyone found guilty of conspiracy to overthrow the United States Government or to interfere with the operation of its laws shall be guilty of a high crime." *See* C. Ellen Connally, *The Use of the Fourteenth Amendment by Salmon P. Chase in the Trial of Jefferson Davis*, 42 Akron L. Rev. 1165, 1165 (2009)."

47.    "The offenses for which exclusion from office is denounced are not merely engaging in insurrection... but the giving of aid or comfort to their enemies. They are offenses not only of civil but of foreign war." *In re Griffin*, 11 F. Cas. 7 (C.C.D. Va. 1869). In that case, Judge Chase, whom himself was balancing his need for impartiality with his desire to pursue the Presidency, insinuated that the inclusion of the "aid or comfort" disqualifier in Section 3 of the 14th Amendment applied only in the context of a foreign invasion or war. Judge Chase was an abolitionist but still a politician who considered campaigning for the Presidency and did not want to upset the South by declaring that the reference in Section 3 to "enemies" applied to the insurrectionists and rebels that fought for the Confederacy. Giving "aid and comfort" to foreign enemies was already covered

by the Treason Clause in Article III, Section 3, Clause 1 of the United States
Constitution. Section 3 of the 14th Amendment, being a post-civil war
amendment, was referring solely to *domestic* enemies that engaged in insurrection
or rebellion against the United States and had previously given an oath to support
the Constitution; thereby only targeting higher-level officials that are required to
take oaths.

48.    This is supported by the fact that the "final version of Section 3
reflected a refinement of the radicals' philosophy of formal equality. Opposition to
the broader House proposal arose in part from the widespread view that many
Confederate soldiers, even if not conscripted, had little real choice but to join the
Southern cause. In that light, the final version of Section 3 was not less punitive
so much as it was more targeted. Whereas the House version promised to affect
the rank and file, the Senate version would reach only the senior leadership.
Moreover, the Senate version was, in important ways, harsher than the House
version. The House measure would have sunset in 1870 and applied only to federal
elections. By contrast, the final version [of Section 3] permanently rendered
virtually the entire political leadership of the South ineligible for office, both state
and federal. The final version of Section 3 thus reflected a nuanced view: as
compared with felons, Confederate officials were more deserving of punishment
and Southern foot soldiers were less so." *See* Richard M. Re, Christopher M. Re,
*Voting and Vice: Criminal Disenfranchisement and the Reconstruction
Amendments*, 121 Yale L.J. 1584, 1622–23 (2012); *also see* Eric Foner,

*Reconstruction: America's Unfinished Revolution 1863-1877*, at 259 (1988).

49.   Every federal, state, and local public official that offered words of encouragement, show of sympathy, or expression of support for or defense of, the January 6 Insurrection must, pursuant to Section 3 of the 14th Amendment to the United States Constitution, be declared ineligible to hold any civil or military office in the United States at the federal, state, or local level.

50.   Because the federal judiciary only recognizes fellow candidates as having "standing" to bring disqualification lawsuits in federal courts, Congress must pass enabling legislation to create a private right of action for American voters to challenge qualifications of candidates for public office solely with regard to the words and conduct related to the January 6 Insurrection.

51.   Donald J. Trump is not the only public official ineligible to hold public office under Section 3 of the 14th Amendment. Soon-to-be Defendants whose Plaintiffs will be primary challengers with judicial standing to sue will include, but most *certainly* will not be limited to, Congressmembers Marjorie Taylor Greene (R-Ga.), Mo Brooks (R-Ala.), Lauren Boebert (R-Colo.), Louie Gohmert (R-Texas), Paul Gosar (R-Ariz.), and Andy Biggs (R-Ariz.) for giving "aid or comfort" to insurrectionists.

### Amendment XIV, Section 3, Clause 2

52.   Clause 2 of Section 3 of the 14th Amendment to the United States Constitution reads: "Congress may, by a vote of two-third of <u>each</u> House, remove such disability." (*Emphasis added*).

53.     Plaintiff emphasizes the Constitution's use of the term "each" since there appears to be widespread misconception that only the U.S. House of Representatives is needed to remove the disqualifying disability, which stems from the 1868 case of *Butler*. *See Butler*, 2 Bart. El. Cas. 461 (1868). Therefore, if 290 members of the U.S. House of Representatives and 67 members of the U.S. Senate vote to remove the disqualifying disability, a person otherwise ineligible to hold office under Section 3 of the 14th Amendment could hold office. In today's political climate, this is impossible.

54.     It is also critical to anticipatorily highlight that a Presidential pardon does not remove this disability since the United States Constitution provides that only Congress may lift the disability. This is contrary to an old, outdated, and clearly biased Attorney General Opinion from Southern Confederate Augustus Garland that attempted to limit its scope; it inexplicably ignored the term "each" and suggested a presidential pardon could remove the qualification disability notwithstanding the Constitution's clear and exclusive reservation and delegation of that power solely to Congress. *See Lawton's Case*, 18 Op.Atty.Gen. 149 (1885).

### Scope of Amendment XIV

55.     The disqualification applies to both civil and military positions at both the federal and state level, which has been judicially determined to even include a local constable position. *See U.S. v. Powell*, 65 N.C. 709 (C.C.D.N.C. 1871).

56.     "There can be no office which is not either legislative, judicial, or executive [covered by Section 3 of the 14th Amendment because]... it embraces every office... [and] it was passed to punish those high in authority... for their bad faith toward the government they had sworn [in their oath of office] to support." *Id.*

57.     "The amendment applies to all the states of the Union, to all offices under the United States or under any state, and to all persons in the category of prohibition, and for all time present and future." *In re Griffin*, 11 F. Cas. 7 (C.C.D. Va. 1869).  It is a lifetime ban from public office.

58.     As mentioned before, Section 3 of the 14th Amendment is merely an Anti-Insurrection Qualification Clause. It was not intended to be a punishment for someone who engaged in an insurrection or gave aid or comfort to insurrectionists any more than the Natural Born Citizen qualification clause is punitive. If you are not a natural born citizen of the United States, you cannot hold the Office of the Presidency. If you violated your oath of office by engaging in an insurrection, you cannot hold the Office of the Presidency. It's a mere qualification for the office.

### Enforcement of Amendment XIV

59.     In an attempt to neutralize Section 3 of the 14th Amendment, some commentators dating as far back as 1868 developed the legal theory that this provision of the United States Constitution was unenforceable without enabling legislation. Such a suggestion is ludicrous, frivolous, without merit, and

disrespectful to the United States Constitution.

60.     In fact, it was the President of the Confederacy, Jefferson Davis, who, in 1868, contended that Section 3 was self-executing and, therefore, barred his criminal trial for treason. *See Gerard N. Magliocca, Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comment. 87 (2021). Moreover, it was Judge Chase who agreed in Jefferson Davis' criminal trial that Section 3 was self-executing; thereby, in a flawed theory, implicating the prohibition against Double Jeopardy. *See Case of Davis*, 7 F. Cas. 63, 90, 92-94, (C.C.D. Va. 1867) (No. 3,621a) (describing Davis' argument and the Government's response); *Id.* at 102 (noting the Chief Justice's view). Shortly thereafter, however, Justice Chase reversed his position and declared that Section 3 was not self-executing when a black criminal defendant challenged his conviction on the grounds that the judge presiding over his trial fought for the Confederacy and was, therefore, ineligible to preside over his trial rendering his guilty verdict null and void. *In re Griffin*, 11 F. Cas. 7 (C.C.D. Va. 1869) (No. 5,815). Following these irreconcilable rulings from a clearly biased Justice Chase who could not make up his mind, Congress decided to act on its own by enacting Section 3 enforcement statutes and, shortly thereafter, federal prosecutors began bringing actions to oust ineligible officials, including half of the Tennessee Supreme Court. *See Act of May 31*, 1870 (First Ku Klux Klan Act), ch. 114, § 14, 16 Stat. 140, 143; id. at § 15 (imposing criminal penalties for knowing Section Three violations); Sam D. Elliott, When the United States Attorney Sued to Remove Half the Tennessee Supreme Court: The Quo Warranto Cases of 1870,

49 Tenn B.J. 20 (2013). Congress' enactment of legislation was not an admission that Section 3 was not self-executing; it was to avoid the lunacy of a clearly biased, conflicted, and politically active Chief Justice that could not perform the functions of his office in a neutral, intellectual, fair, and impartial manner.

61.    In 1871, Amos Powell was indicted, via an enabling statute making it a *crime* to knowingly violate Section 3 of the 14th Amendment, "for accepting the office of sheriff when disqualified from holding office by the 14th Amendment... [and the] indictment charged that the defendant knowingly accepted office under the state of North Carolina, to which he was ineligible under the provisions of the 3d section of the 14th Amendment." *See U.S. v. Powell*, 65 N.C. 709 (C.C.D.N.C. 1871). In other words, to attach criminal penalties, enabling legislation is absolutely required since Section 3 of the 14th Amendment makes no reference to criminal penalties.

62.    Congress certainly has jurisdiction to expel or exclude its own members that it determines have violated Section 3 of the 14th Amendment. *See Powell v. McCormack*, 395 U.S. 486 (1969). However, it is unclear whether Congress can unilaterally impose said disability on the Executive Branch since that could be deemed an encroachment on a separate branch of the federal government. Nevertheless, a Congressional finding of liability would certainly aid the federal judiciary's fact-finding mission.

63.    Plaintiff incorporates, by reference, all of the findings of the U.S. House Select Committee to Investigate the January 6th Attack on the United

States Capitol.

64.     Historically, the neutral finder of fact and arbiter of law has been the federal judiciary. Consistent with our principles of federalism and separation of powers, it is more likely that the federal judiciary and, in particular, the United States Supreme Court would be the only authority that the drafters of Section 3 could have possibly envisioned as being the most competent and legitimate body to determine whether an individual is ineligible under the Anti-Insurrection Qualification Clause.

**FACTUAL ALLEGATIONS**

**Donald J. Trump's Candidacy in the 2024 Elections**

65.     Donald J. Trump has received contributions in excess of $5,000, made expenditures in excess of $5,000, given his consent to other to raise $5,000, and given his consent to others to expend $5,000.

66.     Mr. Trump's website, www.donaldjtrump.com, directs all contributions to the Save America JFC, a joint fundraising committee of Save America and Make America Great Again PACs (herein "Trump Junta Committees").

67.     Although the website purports that any contributions are "not authorized by any candidate or candidate's committee," its presence on Mr. Trump's personal campaign website clearly establishes that Mr. Trump has given his "consent" to the Trump Junta Committees to raise and expend funds on his behalf thus making him a statutorily determined deemed candidate. *See* 52

U.S.C. § 30101(2)(B).

68.     Mr. Trump's Trump Junta Committees raised over one-hundred million dollars ($100,000,000.00) in the calendar year 2021, which is well "in excess of what could reasonably be expected to be used for exploratory activities." *See* 11 C.F.R. §§ 100.72(b)(2), 100.131(b)(2).  Even the Commission's own invalid regulations dictate a finding that Mr. Trump is a candidate.  *See Kisor v. Wilkie*, No. 18-15 (S. Ct. 2019).

69.     Mr. Trump has undertaken the activity of aggressively fundraising, which are "activities designed to amass campaign funds that would be spent after he… becomes a candidate." *See* 11 C.F.R. §§ 100.72(b)(2), 100.131(b)(2).

70.     Mr. Trump referred to himself as the "45th and 47th" President of the United States in a video that was made publicly available, viewed by millions of Americans and people around the world, and referenced in numerous national news outlets, foreign news outlets, and even on late-night shows like Jimmy Kimmel Live. This was indisputably an "oral statement[] that refer[s] to him[self]… as a candidate" for the nomination of the Republican Party for the Presidency of the United States.  *See* 11 C.F.R. §§ 100.72(b)(3), 100.131(b)(3).

71.     Mr. Trump has continued and plans to continue holding public rallies, which is indisputably "conduct[]… over a protracted period of time" that establishes himself as a candidate for the nomination of the Republican Party for the Presidency of the United States.  *See* 11 C.F.R. §§ 100.72(b)(4), 100.131(b)(4).

72.     Mr. Trump, fearing that the House Select Committee to Investigate

the January 6th Attack on the United States Capitol will find evidence that he "engaged in insurrection" and thereby render him ineligible and unqualified to hold office, has obstructed the investigation by pressuring witnesses to assert executive privilege, and promising pardons to those currently facing federal criminal prosecution for directly engaging in the insurrection and attack on the Capitol. Because Section 3 of the 14th Amendment is a qualification requirement under both federal and state law, Mr. Trump's actions to obstruct the investigation are "action[s] to qualify for the ballot under State law." *See* 11 C.F.R. §§ 100.72(b)(5), 100.131(b)(5).

73.     Mr. Trump's activities go far beyond "testing the waters" as outlined under 11 C.F.R. §§ 100.72(b)(2)-(5); 100.131(b)(2)-(5).

74.     Mr. Trump has raised donations in excess of over one-hundred million dollars ($100,000,000.00) and hosts numerous rallies throughout the country. He has obstructed the House Select Committee investigation of the January 6th attack on the United States Capitol with the intent to avoid being rendered ineligible and unqualified to hold office under federal and state law.

### Donald J. Trump's Role in the

### January 6 Insurrection

75.     On January 6, 2021, as insurrectionists laid siege to the United States Capitol, Mr. Trump took no action despite being repeatedly contacted by family and friends to call off the attack; thereby impliedly ratifying the insurrection.

76.    When Mr. Trump finally spoke on the matter, speaking directly to the insurrectionists, he said "we love you, you're very special." These were words of encouragement and an irrefutable display of sympathy with the insurrectionary movement.

77.    On Saturday, January 29, 2022, a little more than one year after the January 6 Insurrection, showing absolutely no remorse, Mr. Trump publicly declared that "If I run and I win, we will treat those people from January 6 fairly... and if it requires pardons, we will give them pardons." More words of encouragement, displays of sympathy, and ratification of the insurrectionary attack on the United States Capitol.

78.    In the entire history of the United States, there has never been a President or a Presidential candidate that has publicly vowed to pardon criminals that brazenly attacked a separate branch of the federal government. And one day, it may be this Court or the United States Supreme Court that insurrectionists come looking for.

## COUNT ONE
### COMPEL THE FEDERAL ELECTION COMMISSION TO DEMAND FEC FORM 2, STATEMENT OF CANDIDACY, FROM DONALD J. TRUMP

79.    Plaintiff incorporates Paragraphs 1 through 78 as if fully set forth herein.

80.    Based on all of the foregoing, it is clear and irrefutable that Mr. Trump has become a "candidate" seeking to be the "47th" President of the United States as Mr. Trump has expressly referred to himself.

81.     As a deemed "candidate," Mr. Trump is legally subject to any and all campaign finance laws, including, but not limited to, the reporting requirements under 52 U.S.C. § 30104.

82.     Pursuant to 52 U.S.C. § 30102(e), as a deemed "candidate," Mr. Trump is legally required to "designate in writing a political committee… to serve as the principal campaign committee."

83.     The Commission has the duty to recognize Mr. Trump a candidate for the 2024 Presidential Election, require full compliance from Mr. Trump, and require that Mr. Trump file his FEC Form 2, Statement of Candidacy.

## COUNT TWO
### COMPEL THE COMMISSION TO BLOCK ACCEPTANCE OF DONALD J. TRUMP'S FEC FORM 2

84.     Plaintiff incorporates Paragraphs 1 through 83 as if fully set forth herein.

85.     Plaintiff requests that the Commission block the acceptance of Mr. Trump's FEC Form 2, Statement of Candidacy, on the basis that accepting it would constitute unlawful state action inflicting a competitive injury on Plaintiff and bestowing an unlawful competitive advantage on Mr. Trump in violation of Section 3 of the 14th Amendment to the United States Constitution.

86.     Mr. Trump violated his Oath of Office when he "engaged in" the insurrection on January 6, 2021, and/or provided "aid or comfort" to the insurrectionists on *and after* January 6, 2021, and rendered himself ineligible to hold public office under Section 3 of the 14th Amendment to the United States

Constitution.

87.     Mr. Trump's actions strip him of the required qualifications under the United States Constitution to hold any political office in the United States. Put plainly, Mr. Trump would be ineligible to hold the office of a city councilman in Palm Beach, Florida. He is forever banned from any and all public offices for the remainder of his life unless both the House and Senate, each by a two-thirds majority, vote to remove said disability.

88.     Based on the foregoing, the Court must order the Commission to reject Mr. Trump's FEC Form 2, Statement of Candidacy, lest this Court believes that the Commission's acceptance of the form would neither constitute unlawful state action nor inflict a competitive injury on Plaintiff contrary to established case law.

RELIEF REQUESTED

WHEREFORE, Plaintiff, JOHN ANTHONY CASTRO, requests that this Court finds that:

A.     The Commission's regulations are invalid as a matter of law for being contrary to the clear and unambiguous statute, the plain meaning of the terms in the statute, and Congressional intent.

B.     The Commission shall recognize Mr. Trump as a deemed candidate and demand proper compliance from Mr. Trump.

C.     Because Mr. Trump "engaged in" an insurrection and provided "aid or comfort" to the insurrectionists that violently attacked the United States

Capitol on January 6, 2021, the Commission's acceptance of Mr. Trump's FEC Form 2, Statement of Candidacy, would constitute unlawful state action in violation of Section 3 of the 14th Amendment, result in a competitive injury to Plaintiff, and bestow an unfair competitive advantage to a constitutionally ineligible individual.

      D.     As such, the Commission must be enjoined from accepting Mr. Trump's FEC Form 2, Statement of Candidacy.

      E.     Such other and further relief that this Court deems equitable and proper.

## PRAYER

WHEREFORE, Plaintiff, JOHN ANTHONY CASTRO, respectfully prays that the Commission be cited to appear and answer, and that upon final trial hereof, that this Court awards the relief requested above, together with such other relief to which Plaintiff may be entitled.

Respectfully submitted

July 25, 2022           By

JOHN ANTHONY CASTRO
12 Park Place
Mansfield, TX 76063
Tel. (202) 792 - 6600
J.Castro@JohnCastro.com

**PLAINTIFF *PRO SE***